IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**MARTIN CLIFFORD**                                                          **PLAINTIFF**


**v.**                                                          **CIVIL ACTION NO. 1:20-cv-344-TBM-RPM**


**HARRISON COUNTY, MISSISSIPPI; HARRISON
COUNTY SHERIFF'S DEPARTMENT; and SHERIFF
TROY PETERSON, in his official capacity**                    **DEFENDANTS**


## MEMORANDUM OPINION AND ORDER

Plaintiff, Martin Clifford, brought this action pursuant to 42 U.S.C. § 1983, against Sheriff Troy Peterson, in his official capacity, the Harrison County Sheriff's Department, and Harrison County. The essence of the claim is that his Fourth Amendment rights were violated when, while carrying a concealed firearm into the Harrison County Courthouse, the officer at the security checkpoint took time to confirm that Clifford possessed a valid enhanced carry license permitting him to carry the firearm to the second floor of the courthouse. A hearing in this matter was held on November 1, 2021, where the Court heard oral arguments of counsel. The Court finds that Sheriff Peterson's policy—of ensuring that armed individuals who have business on the second floor of the Harrison County Courthouse hold a valid concealed carry license before being permitted upstairs—did not result in a violation of Clifford's Fourth Amendment rights and that his claims are dismissed.

# I.    FACTUAL BACKGROUND

The crux of Clifford's claims against the Defendants pertains to the policy of checking the validity of Clifford's concealed carry permit,[1] prior to allowing him to enter the second floor of the Harrison County Courthouse. In his Complaint, Clifford alleges that on October 8, 2019, during a visit to the Harrison County Courthouse in Gulfport, Mississippi, for the purpose of absentee voting, he informed the deputy on duty that he was a lawfully armed enhanced carry licensee. [1] at ¶ 10; [33-2] at 2. After complying with the deputy's request to state his business for visiting the courthouse, Clifford gave the deputy his license and identification so the deputy could verify its validity. *Id.* at ¶ 11. When the deputy returned his license, Clifford proceeded to the second floor to conduct his business. Clifford testified that this process took "at least 10 to 15 minutes" and that is the time period that it generally takes for deputies to complete the verification of the license. [33-2] at 6.

Clifford further alleges that on September 10, 2020, he was "once again unlawfully detained" by a deputy at the security checkpoint at the Harrison County Courthouse for "no less than twenty-seven minutes" while Deputy Jacob Morgan verified his concealed carry license. [1] at ¶¶ 31-32. In his deposition, Clifford stated that in addition to these two occasions, he visited the courthouse on July 2, 2019, July 29, 2019, and October 8, 2019. [33-2] at 3-5. At each of these visits, the process of verifying that he had a valid concealed carry license took the deputy on duty between ten and fifteen minutes. [33-2] at 3-8. Clifford claims that Sheriff Peterson's policy of confirming the validity of an enhanced concealed carry license before allowing an armed individual to enter

---

[1] Clifford possesses a license to carry a concealed pistol or revolver pursuant to MISS. CODE. ANN. § 45-9-101 and has undergone the training to obtain an "enhanced" concealed carry license, pursuant to MISS. CODE. ANN. § 97-37-7. [1] at ¶ 8.

the second floor of the courthouse violates his Fourth Amendment right to be free from unlawful search and seizure.

### 1.  **Courthouse layout and security policy**

The Harrison County Courthouse, located in Gulfport in the First Judicial Distrrict, is a two story, multi-use building. The second floor consists of "nine (9) courtrooms, jury rooms, witness rooms, [the] Grand Jury room, [the] Sheriff's office, [the] District Attorney's office, entry to Court Administrator's office, entrance to Court Clerk's office and hallway to the judges' chambers." [33-1] at 4. According to Sheriff Peterson, the courthouses in both the First and Second Judicial Districts of Harrison County "are antiquated and their physical characteristics make security challenging." *Id.*

Individuals may enter the courthouse from a number of entrances on the first floor and may conduct their business on that level without passing through a screening checkpoint. The first floor of the Harrison County Courthouse consists of the following: Chancery Clerk's office, Land Records, Passport office, Tax Collector's office, Veterans Affairs office, and the Harrison County Board of Supervisors' offices. The second floor of the Harrison County Courthouse consists of the Circuit Clerk's office, the law library, and the areas described in Sheriff Peterson's affidavit such as courtrooms, witness rooms, and hallways to judges' chambers. Since there are areas on the second floor where guns and other weapons are prohibited, individuals who wish to go to the second floor must go through a security checkpoint at the bottom of the stairway. [33-1] at 1. In addition to private security officers provided by the Harrison County Sheriff's Department to conduct screenings, the Harrison County Sheriff's Department has added some of its own deputies to assist with checkpoint screenings in the last few years. *Id.* at 2.

By order of the judges of Harrison County on March 20, 2012, courtrooms and the areas where guns are prohibited in the courthouse were defined. Sheriff Peterson was instructed to implement electronic screening procedures to enforce the order. [33-1] at 2. On August 15, 2018, the judges of Harrison County entered a subsequent order further defining the accessible areas in and around the courtrooms which prohibited the possession of guns in those areas. *Id*. Sheriff Peterson was again directed to implement electronic screening procedures at the Harrison County courthouses and to enforce compliance with the court's order. *Id*. A notice was posted at the security checkpoints advising persons entering the courthouse that knives and other weapons, including legally permitted firearms, were not allowed beyond the checkpoints. *Id*.

In mid-2019, Sheriff Peterson implemented "a policy that would require enhanced carry licensees to sign a sign-in log at the security checkpoint to ensure their business in the courthouse was not in a prohibited area or the courtrooms." [33-1] at 3. In addition, after a "check to confirm the special license was valid and not expired, suspended or revoked," the "enhanced carry licensee was permitted beyond the security checkpoint to conduct business in authorized offices located on the second floors while in possession of a gun." *Id*. These policies continue to be in place at the Harrison County courthouses. According to Sheriff Peterson, an individual with a valid enhanced concealed carry permit has never been denied access to the courthouse or detained in any manner. *Id*. at 4. Sheriff Peterson implemented the policies in an effort to ensure the safety and security of both the Harrison County residents who have business in the courthouse and the employees who work there. *Id*. Understanding that there are some individuals who are not allowed to have guns in the courthouse, and there are others who are not even allowed to possess a gun, Sheriff Peterson testified that:

> [i]t is my job to ensure a policy that takes all of these factors into consideration along with the general safety concerns of our antiquated courthouses and a reasonable plan to ensure all enhanced concealed carry licenses are current, valid and not suspended or revoked. I've done that with the fixed security checkpoint located prior to entry into areas where the District Attorneys Office, judges chambers, court staff, county offices, law enforcement offices, detention facilities, courtrooms, and witness rooms are located. This security checkpoint further ensures the necessary screening as ordered by the Judges and is as convenient of a location possible for those persons needing to get to the second floor for business or court.

*Id*. at 5.

According to Captain Odis Easterling, the former Captain over the Firearm Permit Division of the Mississippi Department of Public Safety, there are a number of eligibility requirements which must be met by a person before being allowed to carry a concealed pistol. [33-6] at 2. A concealed carry permit, which is valid for five (5) years from the date of issuance, may be suspended or revoked after issuance if any of the eligibility requirements are no longer met. *Id*. For example, a previously valid permit can be revoked for criminal acts, habitual drug and alcohol abuse, and mental illness occurring since the issuance of the license. *Id*. Persons with *enhanced* concealed carry permits "are authorized to carry weapons in courthouses, except in courtrooms, during a judicial proceeding; places of nuisance; any police, sheriff or highway patrol station or any detention facility, prison or jail." [33-6] at 3. Persons who only possess permits to carry a concealed firearm may not carry their firearm into a courthouse. *Id*. An automated listing of concealed carry and enhanced carry license holders is available at all times to law enforcement agencies through the Mississippi Crime Information Center. *Id.*

### 2. Clifford's visits to the courthouse

In his Complaint, Clifford describes instances on October 9, 2019, and September 10, 2020, in which he was "unlawfully detained when trying to enter the courthouse for lawful business." [1] at ¶¶ 9, 31. In his deposition, Clifford testified there were a total of five (5) instances. With the

exception of his visit on September 10, 2020, the process of entering the courthouse and going through the security checkpoint and license validation procedure took between ten (10) and fifteen (15) minutes. Clifford asserts that the entire process took twenty-seven (27) minutes on his visit to the courthouse on September 10, 2020.

Harrison County Sheriff's Department Deputy Jacob Morgan was on duty on September 10, 2020. [33-4] at 1. On that particular day, there was not a deputy at the checkpoint when Clifford arrived. *Id*. The private security personnel on duty requested that a deputy validate the permit so that Clifford could proceed upstairs with his firearm to conduct his business. *Id*. Deputy Morgan testified that while this process normally takes three (3) to five (5) minutes, it took longer on this particular day because a deputy was not present at the checkpoint and had to come from upstairs in the courthouse. *Id*. According to Deputy Morgan,

> Mr. Clifford was not detained at the security check point in any manner. He was not patted down or physically touched. He was never advised that he was not free to leave. He was never advised that he could not request the return of his identification and carry license during the validation process. He was not taken away from the security check point area. He was not taken away from the other people entering the security check point to go upstairs in the courthouse.

*Id*. Once his enhanced carry permit was validated, Clifford went upstairs to conduct his business. During his deposition, Clifford testified that he felt like he was detained because he felt like he could not leave since the deputy had his driver's license and firearm permit. [33-2] at 37.

Clifford does not take issue with the request to see his concealed carry permit and driver's license. Rather, it is Clifford's position that Sheriff Peterson and courthouse security should assume that the permit is valid, and it is unreasonable for them to take steps to verify that the permit has not been suspended or revoked. The narrow issue in this case is whether Sheriff Peterson's policy of checking the validity of a concealed carry permit before allowing its holder to

go upstairs in the Harrison County Courthouse in the First Judicial District resulted in an unconstitutional violation of Clifford's Fourth Amendment rights.

## II.    PROCEDURAL HISTORY

Clifford filed his Complaint on November 13, 2020, against Harrison County, Mississippi, the Harrison County Sheriff's Department, and Sheriff Troy Peterson, in his official capacity, under 42 U.S.C. § 1983, alleging he was unlawfully detained in violation of his Fourth Amendment rights to be free from unlawful search and seizure.

On July 16, 2021, Defendants filed Motions[2] [33] and [36] for Summary Judgment based on Clifford's failure to show that Defendants violated a clearly established constitutional right. On November 2, 2021, the Court held a hearing on these motions.

On January 3, 2022, Clifford filed a Motion [45] to Amend his Complaint, seeking to add Sheriff Peterson in his individual capacity. Additionally, Clifford moved to add a new claim surrounding an incident that occurred on December 29, 2021, involving a partially identified Deputy "Chris ____," who Clifford also sought to add as a defendant in his individual and representative capacity.[3]

---

[2] Defendant Harrison County filed its Motion [36] for Summary Judgment separately and adopted the Motion [33] and Memorandum [34] of Law filed by Defendants Harrison County Sheriff's Department and Sheriff Troy Peterson.

[3] By separate Order [50] on March 30, 2022, the Magistrate Judge denied Clifford's Motion to Amend, which was filed almost one year after the deadline for amendment of pleadings. The Magistrate Judge recognized that Clifford was not prejudiced by not being allowed to amend his Complaint to assert a cause of action for an incident on December 29, 2021, as "the proposed 2021 claim does not present a statute of limitations issue." [50] at 6.

## III.    DISCUSSION AND ANALYSIS

Clifford alleges that he was unlawfully detained in violation of his Fourth Amendment rights when he had to wait between ten and thirty minutes for deputies to determine the validity of his concealed carry license before entering the second floor of the Harrison County Courthouse. Clifford only advances one distinct legal theory of recovery, namely official capacity claims against Defendants Sheriff Peterson, Harrison County, and the Harrison County Sheriff's Department. Clifford makes no claims against Sheriff Peterson or any of his deputies in their individual capacities. Clifford's official capacity Fourth Amendment claim will be addressed below.

Suits against governmental officers or employees in their official capacity are, in reality, suits against the entity that the officer represents. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."); *Kentucky v. Graham*, 473 U.S. 159, 167, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) ("A plaintiff seeking to recover on a damages judgment in an official capacity suit must look to the government entity itself."). Therefore, Clifford's claims against Sheriff Peterson in his official capacity are claims against Harrison County and will be analyzed as such. The issue before the Court is whether Harrison County's[4] policy of verifying a concealed carry permit before allowing an armed individual access to the second floor of the Harrison County Courthouse in the First Judicial District violated Clifford's Fourth Amendment rights.

---

[4] The Court will refer to the defendants, Harrison County Sheriff's Department, Harrison County, and Sheriff Peterson, in his official capacity, collectively as "Harrison County."

A.    **Official Custom or Policy Claims**

Harrison County cannot be liable under Section 1983 under the theory of *respondeat superior*. *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 694). "A municipality is liable only for acts directly attributable to it through some official action or imprimatur." *Valle*, 613 F.3d at 541 (internal citation omitted). The Fifth Circuit has "stated time and again that '[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866-67 (5th Cir. 2012) (quoting *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997)).

To establish liability under 42 U.S.C. § 1983 against Harrison County, Clifford "must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.'" Valle, 613 F.3d at 541 (quoting *Monell*, 436 U.S. at 691). "Policy" in this context means either an official policy adopted and promulgated by a county policymaker, or a "persistent, widespread practice" of officials or employees that "is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). For a "custom" to constitute a policy, a policymaker must have either actual or constructive knowledge of it, and the policymaker must be a lawmaking officer or "an official to whom the lawmakers have delegated policy-making authority." *Webster*, 735 F.2d at 841.

In order to recover against Harrison County based on an official policy or custom under § 1983, Clifford must demonstrate the following: (1) an official policy or custom of which (2) the policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578-79 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). Clifford "must identify the policy, connect the policy to [Harrison County] itself and show that the particular injury was incurred

because of the execution of that policy." *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984).

*See Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (holding it is the

plaintiff's burden to identify a municipal policy or custom which proximately resulted in the

plaintiff's constitutional injury). Additionally, a municipality "may be held liable only for acts for

which it is actually responsible." *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998)

(citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)).

Thus, a municipality cannot be held liable under § 1983 on a respondeat superior theory for acts of

its employees. *Monell*, 436 U.S. at 694.

To prove the third element, Clifford must show that Harrison County acted with

"deliberate indifference to the risk that a violation of a particular constitutional or statutory right

will follow the decision," and he "must demonstrate a direct casual link between the municipal

action and the deprivation of federal rights." *Valle*, 613 F.3d at 542 (quoting *Bd. of Cnty. Comm'rs

of Bryan Cnty. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). Deliberate

indifference is a "stringent standard" that requires "proof that a municipal actor disregarded a

known or obvious consequence of his action." *Brown*, 520 U.S. at 410. "[E]ven *heightened*

negligence" is not enough to reach this degree of culpability. *Valle*, 613 F.3d at 542 (internal

citations omitted) (emphasis added).

### 1.  The Fourth Amendment and Administrative Searches

The Court notes that Clifford does not challenge the constitutionality of producing his

permit and license at the security checkpoint. Clifford's sole complaint is that Harrison County's

policy of verifying the validity of concealed carry permits resulted in violations of his Fourth

Amendment right to be free of unlawful search and seizure. It is uncontested that Clifford

complains of an official policy of which the policymaker (Harrison County) has actual or

constructive knowledge. This case turns on whether Harrison County's policy of confirming the validity of a concealed carry permit before allowing its holder to proceed to the second floor of the courthouse— as opposed to assuming its validity on its face— resulted in a violation of Clifford's constitutional rights. The Court finds that it did not.

The "touchstone" of Fourth Amendment analysis "is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (per curiam) (internal quotation marks omitted). "Reasonableness, of course, depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers," *Id.* at 109 (internal quotation marks omitted), and "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996).

Under the Fourth Amendment, a search of private property without proper consent is unreasonable in all but "certain carefully defined classes of cases" unless it has been authorized by a valid search warrant. *Camara v. Mun. Ct. of City and Cnty. of San Francisco*, 387 U.S. 523, 528-29, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). It is well established that searches conducted as part of a general regulatory scheme, done in furtherance of administrative goals rather than to secure evidence of a crime, may be permissible under the Fourth Amendment without a particularized showing of probable cause. *See Chandler v. Miller*, 520 U.S. 305, 323, 117 S. Ct. 1295, 137 L. Ed. 2d 513 (1997) (citing *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 674-76, n. 3, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989)) ("We reiterate, too, that where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'—for example, searches now routine at airports and at entrances to courts and other

official buildings.*"); *Klarfeld v. United States*, 944 F.2d 583, 586 (9th Cir. 1991) (citing *United States v. $124,570 United States Currency*, 873 F.2d 1240, 1243 (9th Cir. 1989) ("Under the so-called 'administrative search' exception, a limited warrantless search of a person seeking to enter sensitive facilities is lawful if 'conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime."). Nonetheless, "[t]o pass constitutional muster, an administrative search must meet the Fourth Amendment's standard of reasonableness." *Klarfeld*, 944 F.2d at 586 (quoting *United States v. Davis*, 482 F.2d 893, 910 (9th Cir. 1973), *overruled on other grounds*).

"Generally, when a search is conducted for an administrative purpose and pursuant to a regulatory scheme . . . the government may justify a warrantless search by showing that it met 'reasonable legislative or administrative standards.'" *Taylor v. City of Saginaw, Michigan*, 11 F.4th 483, 488 (6th Cir. 2021) (quoting *Camara*, 387 U.S. at 538). In *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616-18, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989), the Supreme Court reaffirmed "the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Nat'l Treasury Emps. Union*, 489 U.S. at 665 (citing *Skinner*, 489 U.S. at 616-18). The court must determine the reasonableness of the search, and weigh "the need for the search, including its likely effectiveness in averting potential harm to the public, against the degree and nature of the intrusion into a citizen's privacy interests." *United States v. Prevo*, 435 F.3d 1343, 1345 (11th Cir. 2006) (citing *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453-55, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990); *United States v. Skipworth*, 482 F.2d 1272, 1275 (5th Cir. 1973)).

Administrative searches have been extended to airports, courthouses, and other government buildings when the public interest in safety outweighs individual privacy interests. *See*

*United States v. Skipworth*, 482 F.2d 1272, 1276 (5th Cir. 1973) (upholding search at an airport and recognizing that "those who actually present themselves for boarding on an air carrier, like those seeking entrance into the country, are subject to a search based on mere or unsupported suspicion."); *Burgess v. Lowery*, 201 F.3d 942, 947 (7th Cir. 2000) (expounding the government's right to require warrantless searches at airports); *Chandler*, 520 U.S. at 323 (noting routine nature of airport and governmental building searches); *Downing v. Kunzig*, 454 F.2d 1230, 1232-33 (6th Cir. 1972) (holding that entrance to a government building predicated on search was constitutional); *McMorris v. Alioto*, 567 F.2d 897, 900-01 (9th Cir. 1978) (extending search validity to state courts on basis of serious threats of violence). In *McMorris*, the Ninth Circuit effectively approved the requirement that a person entering a courthouse must pass through a metal detector. *McMorris*, 567 F.2d at 899. When the metal detector alerted the presence of metals, the individual was allowed to empty his pockets and pass through again. *Id*. If the detector sounded a third time, the person was subject to being frisked and having bags searched before entry. *Id*. After taking judicial notice that "threats of violent acts directed at courthouses have given rise to an urgent need for protective measures," the court found a sufficient state interest that served as a basis for instituting the challenged search procedure. *Id*. at 900. The court also pointed out that any person could leave the courthouse without a further search or questioning if he activated the metal detector, and concluded that there was sufficient freedom from compulsion to meet the requirements of the Fourth Amendment. *Id*. at 899. *See also United States v. Sihler*, 562 F.2d 349, 351 (5th Cir. 1977) (justifying employee's search before entering prison where consent, although required, was voluntarily given and was not the product of coercion).

Where the "primary purpose" of the checkpoint is "to uncover evidence of ordinary criminal wrongdoing," however, the Supreme Court has found that the checkpoints are not

constitutionally permissible. *City of Indianaplis v. Edmond*, 531 U.S. 32, 41-42, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000). The Court cautioned that its holding in *Edmond* "does not affect the validity of border searches or searches at places like airports and government buildings, where the need for such measures to ensure public safety can be particularly acute." *Edmond*, 531 U.S. at 47-48.

According to Sheriff Peterson, Harrison County's policy of creating a security check point before a visitor went up to the second floor of the courthouse was implemented in response to several court orders. [33-1] at 2-3. The purpose of the policy was to ensure that no person without a valid concealed-carry permit was allowed to go upstairs, while carrying a gun, to areas where firearms are prohibited. *Id.* Clifford argues that, since he was never suspected of a crime, there was "absolutely no objectively reasonable basis under established law for him to be detained, a background check performed, his activities monitored, and compelled to provide information about his business." [39] at 4-5.

If the primary purpose of the policy was to "undercover evidence of ordinary criminal wrongdoing," then Clifford might have a leg upon which to stand. *See Edmond*, 531 U.S. at 41-42. However, both sides agree, no one ever suspected Clifford of criminal activity. The stated purpose for the security checkpoint, including the metal detector, was to prevent unauthorized persons from carrying guns upstairs, to areas where guns are prohibited. And these types of checkpoints in public buildings have been routinely found to fall within the "administrative search" exception to the warrant requirement because "the risk to public safety is substantial and real . . . at entrances to courts and other official buildings." *Chandler*, 520 U.S. at 323 (citing *Von Raab*, 489 U.S. at 674-76, n. 3).

If Clifford had any business which could have been accomplished on the first floor of the courthouse, he would not have even gone through the security checkpoint. For example, he could

have checked land records, filed a homestead exemption, ordered a passport, or obtained his car tag, all while carrying his firearm and without having gone through the security checkpoint.

Because of the unique layout of this courthouse, however, and the fact that there are a number of areas where firearms are prohibited on the second floor, Clifford had to go through the security checkpoint before going upstairs. Having made multiple visits to the courthouse while carrying his firearm, Clifford was aware that the process involved a deputy verifying the validity of his concealed carry license and informing the deputy of the purpose of his business upstairs. Clifford takes no issue with Harrison County's policy of requiring individuals to go through a security checkpoint, including a metal detector, before going upstairs in the courthouse. [33-2] at 42. *See Rouse v . Texas Dep't of Crim. Just. Inst. Div.*, 479 F. App'x 612, 614 (5th Cir. 2012) (finding no Fourth Amendment violation where policy required prison employees to pass through metal detector before entering prison); *Day v. Chicago Bd. of Educ.*, No. 97-C-6296, 1998 WL 60770, *6 (N.D. Ill. Feb. 5, 1998) (recognizing the government's interest in the safety of the people in a school board administration building to be indistinguishable from safety concerns at airports, courts, and schools, and finding that the government's interest justifies the minimal intrusion associated with a metal detector). Nor does Clifford take issue with having to present his concealed carry permit and driver's license to the deputy at the security checkpoint. [33-2] at 25-26. *See* MISS CODE ANN. § 45-9-101 (stating concealed carry licensee must carry license and valid identification at all times while carrying pistol and must present both license and proper identification upon demand by a law enforcement officer). Rather, it is Clifford's position that the validity of his concealed carry permit should be assumed on its face, and that any attempt to check its validity —

even though Clifford admits there are a number of reasons a permit might be suspended or revoked during the five years since it was issued—is a violation of his Fourth Amendment rights.

While case law involving screening at courthouses is sparse, running a computerized license check by law enforcement has been found constitutional in other scenarios. In *United States v. Green*, 293 F.3d 855, 856 (5th Cir. 2002), officers followed their policy of stopping every sixth car outside of a military base. When Green could not produce her driver's license and proof of insurance, officers ran a criminal background check on Green's car and the license tag. *Id.* at 857. The Fifth Circuit stated that the Commanding Officer's policy of stopping every sixth car "reasonably advances the purposes of the checkpoint since it deters individuals from driving while unlicensed and or transporting weapons and thereby endangering base personnel." *Id.* at 862. When considering the extent to which the checkpoint reasonably advances its purposes, the court stated:

> The Court has admonished us that this is 'not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.' Furthermore, we should give deference to the military's security concerns.

*Id.* (quoting *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990)). *See also United States v. Rodriguez-Flores*, 249 F. App'x 317, 320 (5th Cir. 2007) (stating the Fifth Circuit has held that "requesting driver's license, insurance papers, and vehicle registration and running computer checks thereon are permissible actions, reasonably related in scope to a valid traffic stop for speeding"); *United States v. Brigham*, 382 F.3d 500, 507-08 (5th Cir. 2004) (finding no constitutional violation where officer requested to examine a driver's license and vehicle registration during a traffic stop and to run a computer check on both to determine

validity); *Corbett v. Transp. Sec. Admin.*, 968 F. Supp. 2d 1171, 1181-82 (S. D. Fla. 2012) (finding no Fourth Amendment violation where passenger's license and boarding pass were taken for examination and passenger had to wait for thirty minutes while belongings were searched).

Just as the military has concern for the security of its facility, the State and Harrison County have a legitimate public interest in ensuring the safety of employees and the public in the Harrison County Courthouse. In *Green*, the checkpoint search outside of the military base was far more intrusive than the facts in this case. While Clifford asserts that he was "detained," he has not presented any evidence that had he requested the return of his permit or license, these items would not have been returned. And Clifford has presented no evidence that he could not have given the deputy a photograph of the items along with his phone number, and returned to the building when the deputy called to confirm that his permit was valid. Instead, Clifford simply waited at the security checkpoint while a deputy confirmed the validity of his license. If an officer is allowed to run computer checks on a driver's license, insurance, and vehicle registration at a traffic stop, then certainly an officer can run a computer check on a concealed carry permit before allowing armed individuals to enter the second floor of a courthouse where all of the following are located: nine courtrooms, adjoining hallways to courtrooms and judges' chambers, jury rooms, witness rooms, the Grand Jury room, the District Attorney's office, entry to the Court Administrator's office, and the Harrison County Sheriff's Office. *See Rodriquez-Flores*, 249 F. App'x at 320. Guns are prohibited in many of these areas.

Not only do the orders on March 20, 2012, August 15, 2018, and June 22, 2020, define the areas where guns are prohibited, but they instruct the Sheriff of Harrison County to implement electronic screening procedures to ensure compliance with the orders. [33-7] at 3-14. Clifford does

17

not challenge any of the judges' orders. Rather, his only complaint is that he had to wait while a deputy confirmed the validity of his license. Sheriff Peterson implemented the policy of verifying concealed carry licenses to ensure that only persons with valid licenses enter upstairs, where there are a number of areas where guns are prohibited. [33-1] at 3. Sheriff Peterson testified that due to the unique physical layout of the courthouse— with several entrances, a number of different types of offices and multiple courtrooms upstairs where guns are prohibited, and the fact that some individuals are not allowed to carry or possess guns anywhere in the courthouse— his policy of validating concealed carry licenses is reasonable and the least restrictive way to ensure the safety of the public and personnel. *See Id.* at 4.

Clifford offers no case law or other support for his position that Sheriff Peterson's failure to assume that his license was valid was a violation of his constitutional rights.[5] Clifford cites *Jauch v. Choctaw County*, 874 F.3d 425 (5th Cir. 2017) where the sheriff and county were held liable for a detention policy which resulted in the plaintiff's ninety-six day detention without due process. *Id.* at 428. Unlike *Jauch* where the plaintiff was actually arrested based on an outstanding warrant, here, Clifford had to wait—on average—between ten and fifteen minutes while a deputy verified

---

[5] In his brief, Clifford refers (but provides no citations) to several Mississippi Attorney General opinions in support of his position. [39] at 8-13. However, none of these opinions are persuasive authority for this Court because they do not address the ultimate issue in this case. *See* Miss. A.G. Opin. No. 2011-00295 (Aug. 31 2011), 2011 WL 5005999, *2 (stating that a firearms permit holder with training endorsement will not violate the law by carrying a concealed handgun into a courthouse); Miss. A.G. Opin. No. 2011-00365 (Jan. 5, 2012), 2012 WL 679139, *2 (stating that permitted individuals must carry license with valid identification at all times and must produce them on demand); Miss. A.G. Opin. No. 2013-00114 (June 13, 2013), 2013 WL 3874213, *3 (stating an individual openly carrying a weapon on the street does not give an officer grounds to detain the individual); Miss. A.G. Opin. No. 2013-00217 (Dec. 2, 2013), 2013 WL 10154259, *3 (stating that enhanced permit holders may not carry firearms into courtrooms during judicial proceedings but regular permit holders can be restricted from entry into courthouse by postage of a sign); Miss. AG Opin. No. 2014-00363 (Feb. 6, 2015), 2015 WL 1524054, *9 (stating a sheriff does not have authority to prevent open carry of weapons into courthouses but must limit entry to concealed license holders); Miss. A.G. Opin. No. 2016-00299 (Aug. 12, 2016), 2016 WL 4965374, *1 (stating a county officer may not deny someone with proper credentials from accessing common areas of courthouse while armed).

that his permit was still valid. *Id.* at 428. And Clifford's cite to the sheriff's behavior in *Jauch* is largely irrelevant because here, there are no claims of individual liability against the sheriff or anyone else.

The Court finds that Harrison County's policy was reasonable under the individual circumstances. *See Illinois v. Lidster*, 540 U.S. 419, 426, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004) (stating that if the primary purpose was valid, the court must then judge the checkpoint's reasonableness on the basis of the individual circumstances). Captain Odis explained that there are a number of reasons that a concealed carry license can be revoked or suspended during the five year period since it was issued. [33-6] at 2. Harrison County's policy of determining the validity of a concealed carry permit is reasonable and furthers a legitimate governmental interest of maintaining public safety in the courthouse. *See Schubert v. City of Springfield*, 589 F.3d 496, 503 (1st Cir. 2009) (noting that just as an officer is justified in attempting to confirm the validity of a driver's license, such a routine check is also valid and prudent regarding a gun license); *Elhady v. Kable* 993 F.3d 208, 223-24 (4th Cir. 2021) (holding that while law enforcement actions in airports are not immune from judicial review, the practice of using terrorism screening methods and inspections did not violate plaintiffs' Fifth Amendment due process rights, even in the atypical instances of three hour delays at the airport). And this "search"—to the extent there was one— was an administrative search conducted for the purpose of "averting harm to the public." *Prevo*, 435 F.3d at 1345 (*citing Sitz*, 496 U.S. *at* 453-55) (affirming the holding that the search of the defendant's car when she visited a correctional facility was reasonable under the Fourth Amendment). *See United States v. Thomas*, 973 F.2d 1152, 1155 (5th Cir. 1992) ("Administrative searches of salvage yards are generally held to be exceptions to the warrant requirement of the

Fourth Amendment because of 'the important state interest in administrative schemes designed to regulate the vehicle-dismantling or automobile-junkyard industry.'") (quoting *New York v. Burger*, 482 U.S. 691, 698, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987)). The intrusion and inconvenience to Clifford was minimal, in that he typically had to wait between ten (10) and fifteen (15) minutes while his license was verified.

Additionally, as the Supreme Court has instructed, it is not the role of the Court "to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Green*, 293 F.3d at 862 (citing *Sitz*, 496 U.S. at 453). Sheriff Peterson, as an elected official, adopted a policy that was reasonable under the circumstances and did not violate Clifford's Fourth Amendment rights.

The security checkpoint, including Harrison County's policy of confirming the validity of concealed carry permits, did not violate Clifford's Fourth Amendment Rights.

### 2. *Monell* Liability

Even if Clifford's Fourth Amendment rights were violated as a result of Harrison County's policy—which this Court finds they were not—the Court cannot find that Harrison County acted with "deliberate indifference" towards Clifford.

As stated above, in order to recover against Harrison County based on an official policy or custom under § 1983, Clifford must demonstrate the following: (1) an official policy or custom of which (2) the policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578-79 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). To satisfy the

"moving force" prong, Clifford must show both culpability and causation. *Piotrowski*, 237 F.3d at 579-80. A municipality is culpable under Section 1983 if: (1) the official policy is facially unconstitutional; or (2) if a "facially innocuous" policy was "promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "Deliberate indifference of this sort is a stringent test, and a 'showing of simple or even heightened negligence will not suffice' to prove municipal culpability." *Id.* "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference . . ." *Alton v. Texas A & M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999). Generally, proving deliberate indifference involves proving a pattern of violations. *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)).

Causation requires a "direct casual link between the municipal policy and the constitutional deprivation." *Piotrowski*, 237 F.3d at 580. A *Monell* plaintiff must "establish both the casual link ("the moving force") and [Harrison County's] degree of culpability ("deliberate indifference to federally protected rights") because "[w]here a court fails to adhere to the rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability." *Id.* (*citing Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998)).

It is unnecessary for the Court to reach this prong in its analysis because it has held that Harrison County's policy of confirming the validity of concealed carry permits before allowing an armed individual to the second floor of the courthouse was reasonable, in light of the security risks

posed. In enacting the policy, Sheriff Peterson was complying with judicial orders and chose the least intrusive manner in which accomplish those orders.

Clifford does make a claim that having to wait for up to twenty-seven minutes, on one occasion, while Deputy Morgan verified his concealed carry license was an unreasonable detention in violation of his Fourth Amendment rights. Clifford testified that the process of validating his permit generally took between ten (10) and fifteen (15) minutes, and that on one occasion, on September 10, 2020, this process took twenty-seven (27) minutes. Deputy Morgan testified that the process usually takes between three (3) and five (5) minutes and that the September 10th check took longer than usual because a deputy was not in the immediate area when Clifford went through the security checkpoint.

As the Court stated above, Clifford only advances one distinct legal theory of recovery, namely official capacity claims against Defendants Sheriff Peterson, Harrison County, and the Harrison County Sheriff's Department. Clifford makes no claim against Deputy Morgan or any other deputy in his individual capacity. This Court has already found that Harrison County's policy of checking the validity of a concealed carry license is not unconstitutional. Clifford's argument with regard to the length of time he waited on one occasion relates to the application of that policy by an individual. Since no claims were alleged against an individual in his Complaint, the Court finds that Clifford's claims with regard to the length of time it took to verify his license are dismissed. *See Riley v. Jackson Cnty. Sheriff's Dep't*, No. 1:04CV98-JMR-JMR, 2005 WL 1683983, *2, n.3 (S.D. Miss. July 19, 2005) (finding the plaintiff's claims as to the manner in which he was subjected to excessive force was immaterial since he only brought official capacity claims against sheriff's department).

Clifford's claim with regard to the incident on September 10, 2020, could conceivably be a failure to train or failure to supervise claim against Sheriff Peterson. However, Clifford does not raise such a claim in his Complaint. Regardless, Clifford has not presented any evidence that the policy was implemented with deliberate indifference to the known or obvious consequences that constitutional violations would result and certainly not toward individuals who hold concealed carry permits and wish to enter the second floor of the courthouse. *Piotrowski*, 237 F.3d at 570-80. *See City of Okla v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) ("[I]t is . . . difficult in one sense to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate.").

Harrison County's policy of confirming the validity of a concealed carry permit before allowing its armed holder to go upstairs in the Harrison County Courthouse for the First Judicial District did not violate Clifford's constitutional rights during his visits to the courthouse. Even if it did, the Court cannot find that Harrison County acted with "deliberate indifference"—which the Court notes was not even argued by Clifford—toward Clifford as to the "known or obvious consequences" of that verification process. *See Brown*, 520 U.S. at 407. Even a showing of "simple or even heightened negligence" will not allow Clifford's claims to survive. *Id*.

Accordingly, Clifford's official capacity claims against Harrison County are dismissed.

**B.    First Amendment Claim**

In his brief in support of his response to the Motion for Summary Judgment, Clifford asserts that the use of a logbook to sign in at the security check point violated his First Amendment Rights. Since a First Amendment claim was not raised in his Complaint, the Court finds that it is

dismissed. *See Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F. 2d 1073, 1078 (5th Cir. 1990) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.").

## C.    Clifford's Claim under the Mississippi Constitution

In his Complaint, Clifford alleges that "the deputy's actions after requesting Plaintiff show his concealed carry license were in violation of not only the Mississippi Constitution Article I Section 23, but also the Fourth Amendment to the United States Constitution." [1] at 5, ¶ 27.

While the Federal Constitution provides a constitutional floor which establishes a minimum level of protection to citizens of all states, nothing prevents a state from exceeding the federal standard. *See Downey v. State*, 144 So. 3d 146, 151 (Miss. 2014) (stating "[w]e are empowered by our state constitution to exceed federal minimum standards of constitutionality"). However, the wording of Article 3, Section 23 of the Mississippi Constitution is almost identical to that of the Fourth Amendment.[6] And the Court can find no indication that the state of Mississippi has added to or built upon the floor established by the Federal Constitution that would provide more individual rights above those provided by the United States Constitution.

And Clifford has neither pointed out any additional rights nor provided any case law or support for this allegation in his Complaint. In fact, a claim under the Mississippi Constitution is not even mentioned in his Response. Clifford's state law claims are deemed abandoned for failure to brief them. *See McCall v. Peters*, 108 F. App'x 862, 863 (5th Cir. 2004) (finding plaintiff

---

[6] The text of Article 3, Section 23 of the Mississippi Constitution provides: "The people shall be secure in their persons, houses, and possessions, from unreasonable seizure or search; and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized."

abandoned state law claims where he failed to brief them); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

For these reasons, the Court finds that any claims under the Mississippi Constitution against Defendants are dismissed.

## IV.    CONCLUSION

**IT IS THEREFORE ORDERED AND ADJUDGED** that Defendants' Motions [33] and [36] for Summary Judgment are **GRANTED** as to the claims against Defendants Harrison County Sheriff's Department, Harrison County, and Sheriff Troy Peterson, in his official capacity, and these claims are **DISMISSED WITH PREJUDICE** and this case is **CLOSED**.

THIS, THE 31st DAY OF MARCH, 2022.

TAYLOR B. McNEEL
UNITED STATES DISTRICT JUDGE